FILED
JUN 2 3 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KERRY CONLEY,<br><br>   Petitioner,<br><br>vs.<br><br>A.P. KANE, Warden,<br><br>   Respondent. | No. C 05-3588 JSW (PR)<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

## INTRODUCTION

Petitioner, a prisoner of the State of California, has filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging the Board of Prison Terms ("BPT") denial of parole during parole suitability proceedings in 2003. Thereafter, Petitioner filed an amended petition. This Court ordered Respondent to show cause why a writ should not issue. Respondent filed an answer, memorandum and exhibits in support thereof. Petitioner has filed a traverse. For the reasons stated below, the petition is denied on the merits.

## BACKGROUND

In 1985, in Los Angeles County Superior Court, Petitioner was convicted of second degree murder and the personal use of a firearm. The trial court sentenced him to a term of 15 years-to-life plus two years in state prison. Petitioner's minimum parole eligibility date was November 8, 1995. In this habeas action, Petitioner does not challenge his conviction or sentence, but instead alleges that his due process rights were

violated by the denial of parole by the BPT during a parole suitability hearing in December 2003.

The BPT relied, in part, upon the following account of Petitioner's commitment offense, as set forth in the California Court of Appeal's decision affirming the conviction and sentence:

> On November 30, 1983, Marsalee Nicholas (Marsy) was with the defendant in a bedroom of his parents' home, when she suffered a shotgun wound to the head at very close range. At the scene, defendant told sheriff's deputies that a shotgun had accidentally discharged when it fell from its place against a bookshelf along the wall. He said he and Marsy had been arguing on a bed when the gun went off.
>
> After hearing defendant's story, a deputy tried to reenact the incident. When the officer could not re-create the shooting as defendant had described it, defendant was taken to the sheriff's station. There, he told a deputy that he did not mean to hurt Marsy.
>
> While defendant was at the station, other deputies returned to the Conley residence and tried to determine the trajectory of the shotgun blast. During their investigation, they found shotgun waddings on the bed. The location of the waddings was not consistent with the path the shotgun blast should have followed if defendant's story were accurate. The deputies also noticed open beer bottles and what appeared to be "marijuana roaches."
>
> When the investigators returned to the sheriff's station, defendant was advised of his constitutional rights. This was approximately ten hours after Marsy's injury and death. After deputies told defendant that inconsistencies existed in his original version of Marsy's wounding, defendant admitted that he had lied. He then stated that the shotgun had been on the sideboard of the bed and that he had reached over for it as he and Marsy were preparing to go to bed. According to defendant, he swung the gun's muzzle across his body and it discharged. However, this story also appeared to be inconsistent with the physical evidence regarding the shotgun blast's trajectory.
>
> During defendant's interrogation, he told deputies that he and Marsy had had an "on-again off-again" relationship for about three years. About two or three months before the shooting, defendant had asked her to move out of his place. At some point, defendant became suspicious that Marsy was sexually involved with someone else and started checking around to confirm his suspicions.
>
> On November 29, a day before her death, Marsy's new boyfriend, Eddie Erickson (Erickson) called defendant at Marsy's request. When Erickson told defendant about his relationship with Marsy, defendant said that Marsy had been lying to him and that he was disappointed in Erickson for not telling him what had been going on. Defendant also said something like, "I

> don't get mad. I get even." He further stated, "I wouldn't hesitate to blow your head off."
>
> That same day, defendant called Marsy at her parents' home. Defendant was screaming over the phone and Marsy's mother overheard him use the words "whore" and "slut." The defendant called three more times in an agitated state.
>
> That afternoon and evening, defendant spent the day with Dainard Autry (Autry). Defendant consumed close to a case of beer and a drink of hard alcohol during that time. Although defendant told deputies he had been out driving with Autry that day, he never mentioned that he had been drinking.
>
> During trial, Autry recalled an incident when he and defendant were at his family's cabin at Shaver Lake. He heard defendant on the phone and based on the conversation he overheard, Autry assumed that defendant was talking to Marsy. After that conversation ended, defendant told Autry that he should "blow her fucking head off." Defendant had been drinking that day and might have smoked some marijuana. This occurred within a week of Marsy's death.
>
> After Autry heard about Marsy's death, he reminded defendant of the conversation he had overheard at Shaver Lake. Although the defendant denied having killed Marsy, he told Autry that it would not be a good idea to say anything to anybody about that conversation.

(Resp. Ex. 3 at 16; Ex. 4 at 2-5.)

Petitioner offered the following account of the incident at the hearing:

> Well, we were – we were discussing issues and I was trying to get her attention, trying to gain her attention. And without any forethought whatsoever, I picked up the shotgun and discharged – fired it over her head out of the window. And this (indiscernible) here. And I didn't even realize she had been hit until I looked up . . . It was an extremely stupid and irresponsible thing to do. What I was trying to do was gain her attention. The intention was to fire out the window. I look back at it now and I realize how stupid and dangerous that actually is.

(Resp. Ex. 3 at 26-27.) He further stated that he had fired the shotgun before, and he should have realized he would not be able to control the direction of the blast. (*Id.* at 27-28.) At the hearing, he also testified that he had previously kicked and pushed Marsy during their relationship, to prevent her from kicking him in the groin. (*Id.* at 29-30.) He had also slapped another girlfriend, broke another woman's windshield with his hand, and shot holes in walls, windows, cabinets and a television. (*Id.* at 37-38.) He described himself as having an anger management problem since age 15 or 16 when he began

drinking alcohol. (*Id.*)

The BPT found that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety. The presiding Commissioner explained that, in deciding to deny parole, the panel considered Petitioner's commitment offense, his social history, his programming and behavior in prison, his psychological evaluation, his parole plans and the Los Angeles County District Attorney's opposition to parole. Petitioner challenged the BPT's decision in the Los Angeles County Superior Court, which issued a reasoned opinion denying Petitioner's claims. The California Court of Appeal and the California Supreme Court summarily denied Petitioner's habeas petitions, and thereafter Petitioner filed the instant federal petition for a writ of habeas corpus.

**DISCUSSION**

A.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction." *White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004). Under AEDPA, this court may entertain a petition for habeas relief on behalf of a California state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." *Id.* at § 2254(d). Under this deferential standard, federal habeas relief will not be granted "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

B.  Legal Claims and Analysis

Petitioner claims that the BPT's denial of parole in 2003 violated his right to due process because the decision was not supported by any evidence, and because the decision was made pursuant to the BPT's "anti-parole" policy.

1.  The BPT Decision

California's parole scheme provides that the BPT "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b). In making this determination, the BPT considers various factors, including the prisoner's social history, the commitment offense and prior criminal history, and his behavior before, during and after the crime. *See* Cal. Code Regs. tit. 15, § 2402(b) – (d).

The record shows, and there is no dispute, that the BPT panel afforded Petitioner and his counsel an opportunity to speak and present their case at the hearing, gave them time to review Petitioner's central file, allowed them to present relevant documents and

provided a reasoned decision denying parole. The panel concluded that Petitioner "is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." (Resp. Ex. 3 at 113.) The panel explained that it found that the commitment offense was committed in an "especially cruel and brutal manner" and demonstrates an "exceptionally callous disregard for human suffering" insofar as Petitioner shot the victim in the head at very close range. (*Id.* at 113-14.) Petitioner twice lied to the police about what happened, and the panel found that at the hearing Petitioner presented a "third story" in which he claimed to have been trying to shoot over the victim's head. (*Id.* at 114.) The panel also found the motive for the crime – his jealousy about the victim's relationship with another man – to be very trivial in comparison with the gravity of the offense. (*Id.* at 113.) The panel further found that Petitioner had an unstable social history insofar as he had dropped out of high school, had convictions for hit and run and being under the influence of drug and alcohol, and had admitted to selling and buying drugs. (*Id.* at 114-15.)

The panel further found that Petitioner had not sufficiently participated in self-help programming. (*Id.* at 115.) Although he began participating in drug and alcohol recovery programs in 1987, he stopped such participation between 1995 and 2001. (*Id.* at 42-43.) He had only recently resumed such programs, in 2001, and he could not remember the program's "steps." (*Id.* at 44-45.) The panel further noted the most recent opinion of a prison counselor was that Petitioner would pose an unpredictable degree of danger to the public if released. (*Id.* at 115.) The Los Angeles County District Attorney also opposed parole. (*Id.*) The Board did commend Petitioner's lack of disciplinary problems in prison over the last ten years, his positive work reports from supervisors, his AA degree, and his parole plans, which included offers of employment. (*Id.* at 115-16.)

2. The State Court Decisions

The state superior court found that the panel's denial of parole was supported by

"some" evidence in the record. (Resp. Ex. 9.) Specifically, the court cited the Board's findings with respect to the circumstances of the murder, Petitioner's history of unstable relationships, his prior record of violence, and his insufficient participation in self-help programs, which findings the superior court found to be supported by some evidence in the record. (*Id.*) The California Court of Appeal and the California Supreme Court summarily denied Petitioner's habeas petitions. (Amended Petition, Apps. B & D.)

3.     The Federal Right to Due Process

California's parole scheme "gives rise to a cognizable liberty interest in release on parole" which cannot be denied without adequate procedural due process protections. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002). The determination does not depend on whether a parole release date has ever been set for the inmate because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 914-15 (9th Cir. 2003).

Due process requires that "some evidence" support the parole board's decision finding him unsuitable for parole. *Sass*, 461 F.3d at 1125 (holding that the "some evidence" standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985), applies to parole decisions in § 2254 habeas petition); *Biggs*, 334 F.3d at 915 (same); *McQuillion*, 306 F.2d at 904 (same). The "some evidence" standard is minimally stringent and ensures that "the record is not so devoid of evidence that the findings of [the BPT] were without support or otherwise arbitrary." *Hill*, 472 U.S. at 457. Determining whether this requirement is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Id.* at 455-56 (quoted in *Sass*, 461 F.3d at 1128). Due process also requires that the evidence underlying the parole board's decision have some indicia of reliability. *Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904. In sum, if the parole board's

determination of parole unsuitability is to satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision. *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005).

The evidence before the BPT indicated that Petitioner continued to pose an unreasonable risk of danger to society. To begin with, Petitioner shot the victim in the head at close range. There was also evidence that Petitioner had been planning to kill her in that he had recently been heard to threaten to "blow" the heads of the victim and her boyfriend "off." In addition, the motive for the offense, Petitioner's anger at the victim's relationship with another man, was certainly trivial compared to the gravity of the offense. Moreover, Petitioner had an unstable social history, insofar as he had dropped out of high school, had a history of drug and alcohol abuse, had convictions for hit and run and being under the influence of drugs and alcohol, and had previously been violent with both the victim and prior girlfriends. The psychological evaluation found that Petitioner did not present a high risk of danger if released under normal circumstances, but such a risk increased dramatically if Petitioner became involved in drugs and alcohol again. The record indicated that Petitioner's participation in drug and alcohol recovery programs in prison was only limited in that he had only recently resumed such programs and he was not well-versed in the program's "steps." Additionally, Petitioner had not fully accepted responsibility for the offense in that at the hearing he presented a new account of the murder in which he only accidentally shot the victim because he was aiming over her head. Petitioner's statement that this behavior was "stupid" and "dangerous" hardly captures the full gravity of a murder in which he shot the victim in the head from very close range. Such evidence amounts to "some evidence" in support of the BPT's determination that Petitioner continued to present a risk of danger if released to the public, and consequently that Petitioner was not suitable for parole.

The Ninth Circuit has noted that "over time" the BPT's "continued reliance in the

future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment" would "raise serious questions involving his liberty interest in parole." *Biggs*, 334 F.3d at 916. However, in this case the BPT's denial of parole was not only based upon Petitioner's commitment offense; there were numerous other reasons, described above, for their denial of parole as well. In any event, the challenged parole denial here took place when Petitioner had served approximately 18 years in prison, which is not long after the minimum term of 17 years (15 plus two years) of his sentence. Thus, not enough time had elapsed for the BPT's reliance on the commitment offense to raise the due process concerns discussed in *Biggs*.

Based upon the record in this case, the state courts' determination that there was some reliable evidence to support the BPT's decision, and that Petitioner's right to due process was not violated, was not contrary to or an unreasonable application of federal law. *See, e.g., Rosas*, 428 F.3d at 1232-33 (upholding denial of parole based on gravity of offense and psychiatric reports); *Biggs*, 334 F.3d at 916 (upholding denial of parole based solely on gravity of offense and conduct prior to imprisonment); *Morales*, 16 F.3d at 1005 (upholding denial of parole based on criminal history, cruel nature of offense, and need for further psychiatric treatment). Accordingly, habeas relief is not warranted on this claim.

4. "Anti-Parole" Policy

Petitioner further argues that the BPT possesses an "Anti-Parole Policy" that is biased and violates his constitutional rights. There is no evidence in the record indicating that this alleged policy affected the BPT's decision or served as the basis for denying Petitioner parole. To the contrary, the transcript from Petitioner's 2003 parole hearing demonstrates that he received an individualized assessment of his potential parole suitability. Petitioner's reliance on the high percentage of parole denials for life inmates provides no proof of the BPT's alleged bias against parole. *Cf. California Dept.*

9

*of Corrections v. Morales*, 514 U.S. 499, 510-11 (1995) (citing that 90 percent of all California inmates are found unsuitable for parole as evidence that deferring annual parole suitability hearings was lawful and reasonable). Consequently, Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED: 6/23/08

JEFFREY S. WHITE
United States District Judge

10

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

CONLEY,

        Plaintiff,

v.

KANE et al,

        Defendant.

Case Number: CV05-03588 JSW

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on June 23, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Law Offices of Joseph V. Camarata
1410 Georgia Street
Vallejo, CA 94590

Dated: June 23, 2008

Richard W. Wieking, Clerk
By: Monica Narcisse, Deputy Clerk